Nellie **WILLIAMS** et al., Plaintiffs,

Minnie Merli, Plaintiff-Appellant,

v.

Fred ST. CLAIR et al.,
Defendants-Appellees.

No. 78–1625.

United States Court of Appeals,
Fifth Circuit.

Jan. 28, 1980.

Dennis L. Horn, Hazlehurst, Miss., Gill Deford, Nat'l Senior Citizens Law Center, Los Angeles, Cal., for plaintiff-appellant.

Thomas E. Childs, Jr., Jackson, Miss., for state defendants.

Robert E. Hauberg, U.S. Atty., L. A. Smith, III, Asst. U.S. Atty., Jackson, Miss., Alvin N. Jaffe, Carl H. Harper, Eva H. Goldstein, Asst. Reg. Attys., Dept. of HEW, Atlanta, Ga., for federal defendants.

Before COLEMAN, Chief Judge, RONEY and FAY, Circuit Judges.

COLEMAN, Chief Judge.

In the companion case of *Norman v. St. Clair*, 610 F.2d 1228, decided today, we addressed the propriety of Mississippi's deeming practices in determining Medicaid eligibility.[1] Here we must examine the state's spend-down procedures.[2] We find no statutory or constitutional impediment to their operation.

The general operation of the federal-state Medicaid scheme is outlined in *Norman*. States which employ more restrictive eligibility guidelines than those existing under the current Supplemental Security Income Program (SSI), the so-called "209(b) exception", 42 U.S.C. § 1396a(f), must allow Medicaid applicants to "spend-down," by incurring medical expenses, the amount by which their incomes exceed the eligibility levels. Under the Medicaid statute and regulations, states have discretion in selecting the spend-down period. Mississippi has selected a period of six months. For non-institutionalized persons, then, the state multiplies by six (the length of the spend-down period) the amount by which the applicant's income exceeds $150 (surplus monthly income) to determine the applicant's spend-down amount. If during the six-month period the applicant incurs medical expenses at least equal to the spend-down amount, the applicant becomes eligible for Medicaid. *See* Mississippi Department of Welfare Manual, Vol. III, § M, pp. 9649b–9661b [hereinafter cited as Welfare Manual].

---

1. Although *Williams v. St. Clair* also raised challenges to the deeming procedures, for convenience we deal with all those issues in our decision in *Norman v. St. Clair*.

2. The District Court, in its opinion covering the consolidated cases, upheld Mississippi's spend-down requirements.

When this case was filed, Mississippi required that the applicant present proof of incurred expenses. An applicant could not anticipate or project expenses, even though those might be readily ascertained and verified.

Plaintiff Wharey Wilson, a nursing home resident, became ineligible for Medicaid when the joint incomes of Wilson and his wife exceeded the eligibility cut-off by $48.65 as a result of Social Security and Veterans Administration cost of living increases. Thus, although Mr. Wilson was institutionalized, he was required to incur medical expenses in excess of $2500 before becoming eligible for Medicaid.

Plaintiff Juanita Lee, also a nursing home resident, had income exceeding the eligibility limits by $2.29 as a result of a general cost of living increase for Social Security recipients. Because of this excess, the state required her to spend-down approximately $2,500 over a 6-month period before she became eligible for Medicaid.

Subsequent to the bringing of this suit, the Mississippi Medicaid Commission altered its spend-down requirements to allow both institutionalized and non-institutionalized applicants to use anticipated or projected, rather than actually accrued, medical expenses in meeting the spend-down requirement, where those expenses were predictable and recurring. HEW's regional office in Atlanta informed state officials that the new procedure would not comply with HEW regulations, 45 C.F.R. 248.1.[3] According to HEW, an applicant may not include expenses that he anticipates incurring. The only exception exists in an institutional setting where the beneficiary is in residence and is expected to remain, and the billing rate is fixed. Not desiring to lose federal funding,[4] Mississippi once again changed its spend-down policy, allowing institutionalized applicants to anticipate expenses but requiring non-institutionalized persons to accrue actual expenses.

Plaintiffs amended their complaint to include as a plaintiff Minnie Merli, a non-institutionalized Medicaid applicant suffering from rheumatoid arthritis.[5] At the time she brought suit, she had a spend-down amount of $203.40. Her physician testified that she required one visit per month to a physician, at $15 per visit, and medication costing $49.91 per month. He indicated that Mrs. Merli's condition would slowly and progressively worsen. Plaintiffs allege that low income persons such as Ms. Merli find difficulty in obtaining credit in such large amounts from providers of medical services and drugs. Yet such credit must be received in order for the person to incur the required spend-down amount.

Under Mississippi's current spend-down policy, then, institutionalized individuals are permitted to anticipate predictable medical expenses in order to meet Medicaid eligibility income levels. Non-institutionalized persons are not so permitted and must in fact accrue medical expenses in order to spend-down their excess income. Plaintiffs challenge this policy, arguing first that denying non-institutionalized applicants with necessary and recurring future medical expenses the opportunity to anticipate those expenses violates the Medicaid statute, particularly 42 U.S.C. § 1396a(f), and HEW's own internal regulations. Second, they contend that the practice of allowing institutionalized persons to anticipate expenses while not allowing non-institutionalized persons to do so produces an irrational distinction and violates the Equal Protection Clause. We reject both arguments.

---

3.  At the time of the suit, part of the medicaid guidelines were found in 45 C.F.R. They have subsequently been recodified at 42 C.F.R. part 435.

4.  Mississippi's medicaid program was receiving 78% federal funding. Had the state not gone along with HEW's decision, it would have lost this federal support.

5.  Prior to the amendment of the complaint, the District Court had certified the suit as a class action, with the class defined as follows: all persons in the State of Mississippi (a) whose incomes are greater than the Mississippi maximum medicaid eligibility level and (b) who regularly incur medical expenses greater than the difference between their incomes and the Mississippi maximum medicaid eligibility level.

### A. *Statutory Analysis*

Under § 209(b), states using Medicaid plans more restrictive than the standards under SSI must allow potential Medicaid applicants to spend-down through medical expenses the amount by which their income exceeds the eligibility level. *See Hayes v. Stanton,* 7 Cir. 1975, 512 F.2d 133. Section 209(b) of Pub.L.No.92–603 added § 1902(f) to the Social Security Act, which provides in relevant part:

> . . . no State shall be required to provide medical assistance to any aged, blind, or disabled individual . . . for any month unless such State would be (or would have been) required to provide medical assistance to such individual for such month had its plan for medical assistance approved under this title and in effect on January 1, 1972, been in effect in such month, except that for this purpose any such individual shall be deemed eligible for medical assistance . . . if . . . the income of any such individual as determined in accordance with section 1903(f) (after deducting such individual's payment after title XVI, *and incurred expenses for medical care* as defined in section 213 of the Internal Revenue Code of 1954) is not in excess of the standard for medical assistance established under the state plan as in effect on January 1, 1972.

Pub.L.No.92–603, 92d Cong., 2d Sess. (1972) (emphasis added).[6] The implementing regulations are found at 42 C.F.R. § 435.732(c), (d) which requires states to "deduct from income expenses incurred by the individual or financially responsible relatives for necessary medical and remedial services that are recognized under State law. . . ."[7]

Although the legislative history on this section is sparse, the Report of the House Ways and Means Committee on the bill touches briefly upon it:

Cash assistance families with incomes above the eligibility level would receive medicaid coverage only after incurring medical expenses equal to the amount by which their total income (including cash assistance payments) exceeded the medicaid standard; they would be required to "spend-down" by this amount to establish their eligibility for medicaid. In effect, this amount would be a deductible, increasing in amount as earnings rise and, therefore, avoiding the situation where one dollar of earnings can result in the loss of protection worth several hundred dollars. Medical expenses for this purpose would be defined as those in section 213 of the Internal Revenue Code.

H.Rep.No.92–231, 92d Cong., 1st Sess. (1971), reprinted in [1972] U.S.Code, Cong. & Admin.News, pp. 4989, 5061.

In enacting this provision, Congress built upon the rationale underlying the initial Medicaid act. Under the 1965 program, Congress had stressed that states should employ flexible income standards to take account of the applicant's medical expenses. To prevent situations in which an individual is ineligible because his income exceeds the limit even though the excess may be small when compared with the cost of medical care, Congress required states to "be flexible in the consideration of an individual's income," and stated that "the State's standards for determining eligibility . . . shall take into account, except to the extent prescribed by the Secretary, the cost— whether in the form of insurance premiums or otherwise—incurred for medical care or any other type of remedial care recognized under State law." Accordingly, States were to make sure that "the income of the individual has been measured in terms of

---

**6.** Section 1902(f) has subsequently been amended to read in relevant part that "such individual shall be deemed eligible for medical assistance under such State plan if . . . the income of any such individual as determined in accordance with section 1396b(f) of this title (after deducting any supplemental security income payment and State supplementary payment made with respect to such individ-

ual, and incurred expenses for medical care as recognized under State law) is not in excess of the standard for medical assistance established under the State plan as in effect on January 1, 1972." *See* Pub.L.No.93–233 § 13(a)(10).

**7.** The regulations do not define "incurred expenses".

both the State's allowance for basic maintenance needs and the cost of the medical care he requires." S.Rep.No.404, 89th Cong., 1st Sess. (1965), reprinted in [1965] U.S.Code, Cong. & Admin.News, pp. 1943, 2019. *See also* 111 Cong.Rec. 18349 (July 27, 1965) (statement of Sen. Long presenting summary of Conference Report) (states must provide a flexible income test which takes into account medical expenses).[8]

■ But while Congress has indicated states must consider medical expenses before denying eligibility, Congress has not explicitly addressed the manner in which states may do so. Congress has not, for example, required that states take into account anticipated expenses. It has said only that they must consider incurred expenses. We see no reason to require the state and HEW to give "incurred" a definition beyond its ordinary usage.

■ Because of the congressional emphasis on flexibility, the states and HEW may adopt more liberal definitions if they wish, but they are not statutorily required to do so. HEW, recognizing the predictability and reliability of medical expenses of institutionalized persons, has allowed a more liberal definition in the case of institutionalized applicants. This it may do. On the other hand, because of the possibility of fraud, abuse, and unreliability, HEW has insisted upon the usual definition of incurred for those who are not institutionalized. This it may also do.

In support of their contention that HEW's own regulations require state plans to allow individuals to anticipate expenses plaintiffs cite us to two provisions in the HEW Medical Assistance Manual. These two, under § 4–30–30.B.1.d,[9] mandate that spend-down credit be given to applicants who demonstrate they will accrue medical expenses in the future. These provisions, however, do not control the instant case, as they are applicable only to states which provide optional coverage of the medically needy. Mississippi does not have a medically needy program. The whole thrust of the medically needy program is to extend coverage to those who do not qualify under the categorically needy program. This coverage, therefore, is deliberately more extensive than that required in categorically needy situations. That HEW has allowed all applicants to anticipate expenses under the medically needy program is in keeping with the more comprehensive goal of that program. Such action does not, however, require HEW to promulgate similar regulations for categorically needy programs. The two different approaches are not, as plaintiffs contend, inconsistent, because they apply to two different programs with two different goals.

■ Finally, in examining HEW's exercise of its statutory authority we are guided by the Supreme Court's instruction that " 'the construction of a statute by

8. On the other hand, courts interpreting the pre-SSI medicaid scheme refused to find that the statute automatically required participating states to deduct incurred medical expenses from income in calculating eligibility. *Freeman v. Parham*, 5 Cir. 1973, 475 F.2d 185; *Fullington v. Shea*, 320 F.Supp. 500 (D.Colo.1970), aff'd without opinion, 404 U.S. 963, 92 S.Ct. 345, 30 L.Ed.2d 282 (1971).

9. The sections are as follows:
Within the above guidelines, any medical expenses which are the current liability of the applicant shall be considered, including:
    *    *    *    *    *    *
(2) Prospective debts for services which a physician certifies will be rendered to the applicant during the eligibility period; e. g., where it is determined that the applicant will be liable for the first $200 of

inpatient hospital care he is scheduled to receive, in order to facilitate admission to the hospital, coverage may be authorized with a stipulation that program payments will begin after such liability has been incurred.
    *    *    *    *    *    *
When the applicant can show that, during the period for which his income is evaluated in the eligibility determination, he has incurred or will incur medical expenses in an amount sufficient to reduce his income to the applicable medically needy income level, he is entitled to Medicaid coverage (provided he is otherwise eligible) for any additional care or services he needs which are included in the plan.

those charged with its execution should be followed unless there are compelling indications that it is wrong.'" *New York Department of Social Services v. Dublino*, 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973), *quoting Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). In addition we have stated that plaintiffs shoulder a heavy burden in attacking an administrator's interpretation of the statutory scheme he carries out. *Jacquet v. Westerfield*, 5 Cir. 1978, 569 F.2d 1339, 1344; *Johnson's Professional Nursing Home v. Weinberger*, 5 Cir. 1974, 490 F.2d 841, 844. In light of these constraints and the fact that HEW's construction of the statute is a reasonable one and is within the scope of its statutory authority, we hold that under the statute HEW and Mississippi may allow institutionalized applicants to anticipate expenses while not allowing non-institutionalized persons to do so.

### B.  *Constitutional Issues*

■ Plaintiffs assert that treating institutionalized applicants differently from non-institutionalized ones with regard to spend-down procedures violates the constitutional guarantees of equal protection. We disagree.

In *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the Supreme Court stated that a legislative classification scheme involving welfare funds will withstand an equal protection challenge if it does not make an invidious discrimination, is supported by a rational basis, and furthers a legitimate state interest. The Court further noted that in the area of social welfare, a state does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect. If the classification has reasonable basis, it "does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality'." 397 U.S. at 485, 90 S.Ct. at 1161, *quoting Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

In subsequent cases the Court has consistently reaffirmed the basic principle articulated in *Dandridge*. *See, e. g., Califano v. Jobst*, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977); *Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Mathews v. de Castro*, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976); *Mathews v. Lucas*, 427 U.S. 495, 96 S.Ct. 2755, 49 L.Ed.2d 651 (1976); *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Richardson v. Belcher*, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). *Cf. Jimenez v. Weinberger*, 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974) (reaffirming basic principles of *Dandridge* but finding no rational basis for the classification scheme); *U. S. Department of Agriculture v. Moreno*, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (reaffirming basic principles of *Dandridge* but finding no legitimate government interest or, alternatively, no rational basis).

Mississippi and HEW have an interest in ensuring that those who are not eligible for Medicaid do not receive payments therefor, thereby allowing the state to use its finite resources to provide services to those who are eligible. To support the distinction they draw between the institutionalized and non-institutionalized, defendants point out that when individuals enter nursing homes they are likely to remain there for a long period of time and that nursing home expenses are usually constant or unlikely to decline. It notes further that individuals residing in nursing homes who receive Social Security disability checks pay the amount (less a small amount reserved for their personal needs) to the nursing home, with Medicaid paying only the difference between that sum and the nursing home bill. Thus even though the individual becomes technically eligible for Medicaid on the first day in the nursing home, Medicaid in fact pays only the difference between his monthly check and the nursing home fee, so there is no question that the patient more than satisfies the spend-down requirement. In this situation the state can exercise ad-

ministrative control and know that the spend-down liability had been incurred in a short period of time and begin payment.

In the case of a person living in the community, on the other hand, it is administratively much more difficult to know whether and when the spend-down had been incurred. Moreover, it is less clear that a person with a history of drug or doctor's expenses will continue to visit the doctor or have prescriptions filled even if the doctor recommends that treatment for the patient. Changed circumstances, change of mind, or simple failure to follow through on the doctor's instructions could result in numerous instances where projected expenses failed to materialize.

Thus we hold that the spend-down distinction has a rational basis and furthers a legitimate state interest. We recognize our decision means that in some cases whether a person outside of a nursing home can obtain Medicaid eligibility will depend in large part upon his ability to obtain credit for medical expenses up to the spend-down amount and that this may occasionally result in hardship for those who are unable to obtain the credit and thereby become eligible. It is not our place, however, to fashion a new Medicaid program in the manner which, were we devising one, we would like to see it run. Rather, we are limited to considering whether the spend-down policies before us contravene either their statutory basis or constitutional requirements. They conflict with neither, so we must uphold them.

AFFIRMED.